Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Sep 04 2014, 9:35 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of I.T., S.T., and W.T., minor children, and C.T., Mother, and W.T., Father, | ) ) ) ) | |
| C.T. and W.T., | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 54A01-1402-JT-84 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MONTGOMERY CIRCUIT COURT
The Honorable Harry A. Siamas, Judge
Cause No. 54C01-1308-JT-179, -180, -181

**September 4, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

C.T. ("Mother") and W.T. ("Father") (together, "Parents") appeal the juvenile court's order terminating their parental rights to I.T., S.T., and W.T., arguing that the evidence presented was insufficient to support the termination of their parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother and Father have three children together, I.T., S.T., and W.T. ("the Children"). On April 27, 2012, the Montgomery County Department of Child Services ("DCS") received an "immediate response" call regarding two young boys who were found unattended near the entrance of an apartment complex. *Tr.* at 97. The boys were later identified as I.T. and S.T. The neighbors informed DCS that the Children were out all the time. DCS determined which apartment the Children lived in, and when they went to the apartment, they encountered Father, who had been asleep. Father was wearing an ankle bracelet and could not leave the apartment. DCS determined that the Children had been outside unattended for at least an hour. Mother was at work at that time, but Father was able to reach her, and she came home.

DCS administered a drug screen to Father, which came back positive for amphetamine, hydrocodone, and oxycodone. Although Mother did not seem to be culpable for the Children getting out of the apartment, she did acknowledge to DCS that she had previously had substance abuse issues, so DCS administered a drug screen to her that came back positive for amphetamine. Three weeks later, Father's community corrections was revoked, and he was sent back to jail.

DCS Family Case Manager ("FCM") Kristine Roys was assigned to the case in June 2012. At that time, Father was in jail, and Roys only met with him once, which occurred

2

in the jail. Mother agreed to an informal adjustment, which included substance abuse treatment, mental health treatment, and undergoing services to address parenting skills, housekeeping, budgeting, supervision of the children, and legally taking medication. FCM Roys visited Mother at the apartment randomly due to her concerns about Mother's supervision of the children, cleanliness of the home, and Mother's sobriety. FCM Roys made a home visit on June 27, 2012, and when she arrived, Mother's older daughter, who is not subject to this case, was watching the Children while Mother was at a neighbor's house. The home was very dirty with food ground into the floor and trash "pretty much everywhere." *Tr.* at 91. The apartment was very small, and there was a lot of clutter, which made it very difficult to move around. Mother returned to the apartment and began to yell at the Children to clean up the apartment, while she sat on the sofa. Mother admitted to FCM Roys that Mother used Adderall and agreed to a drug screen. The results of this drug screen came back positive for amphetamine, hydromorphone, and morphine, with the levels of hydromorphone and morphine being greater than the lethal level for such drugs.[1] After the test results came back, DCS decided to remove the Children because the home was not safe.[2] The Children were placed with Maternal Grandmother and her husband, where they have remained for the duration of the proceedings. Mother was eventually evicted from the apartment because she could not afford the rent.

On July 6, 2012, DCS filed a child in need of services ("CHINS") petition regarding the Children. On August 23, 2012, the juvenile court adjudicated the Children to be CHINS

---

[1] A toxicologist explained that such levels can be tolerated by individuals who have built up a tolerance to a drug from taking the drug on a regular basis. *Tr.* at 32.

[2] Mother's daughter, who was not Father's child, was also removed from the home. However, that child was not subject to these termination proceedings and is, therefore, not part of this appeal.

after Parents both admitted that the Children were CHINS. The juvenile court entered a dispositional decree, which ordered Father to contact DCS and request services if he is released from jail. It ordered Mother to, among other things: (1) participate in an intensive outpatient substance abuse treatment program; (2) participate in medication management and counseling; (3) participate in home-based casework services to address stability, finances, organization, and parenting; (4) continue visitation with the Children; (5) provide random drug screens; and (6) maintain suitable housing.

After Mother was evicted from the apartment, she moved into a one-bedroom apartment with Paternal Grandmother, whose landlord did not allow children to live there. DCS would not allow Mother to have visitation with the Children there because of drug use by Paternal Grandmother. In April 2013, after Father was released from jail, Parents moved into an apartment in the same complex as Paternal Grandmother. Father was hired by Kentucky Fried Chicken through his parole, but he never started work there. During the duration of this case, Mother did not have consistent employment; she cleaned houses for a short time and had just began employment cleaning a bank at the time of the termination hearing. Parent's electricity was shut off on April 9, 2013, and they were evicted in May 2013. Parents again moved in with Paternal Grandmother. In August 2013, Father was arrested for violating his parole and was incarcerated up until a week before the termination hearing. At the time of the termination hearing, Mother was living in a crisis shelter, and Father was again living with Paternal Grandmother after being released from incarceration a week prior.

During the pendency of this case, Mother tested positive for various drugs beginning with the drug screen given to her on April 27, 2012 and again with the screen given to her

4

on June 27, 2012. Mother stayed sober for two months after being referred for treatment, but again tested positive for excessive amounts of oxycodone in September 2012. She participated in 24 of 27 classes of an advanced outpatient program by the end of October. However, Mother tested positive for hydrocodone and oxycodone on October 3, November 27, and December 12, 2012 and again on February 12, 2013. On April 11, 2013, Mother tested positive for amphetamine, methamphetamine, and oxycodone and never returned to the drug treatment program. She then tested positive for hydrocodone on April 17, 2013 and for oxycodone on May 16, 2013.

Father was release from incarceration on February 12, 2013 and tested positive for oxycodone that same day. He was referred for a substance abuse assessment by DCS, but he failed to complete the intake process. Father tested positive for hydrocodone on February 28, 2013 and for Xanax and oxycodone on March 19, 2013. On several occasions, Father would refuse to submit to drug screens. Father tested positive for drugs during a parole drug screen on April 10, 2013 and for hydrocodone during DCS drug screen on April 17, 2013. After he again tested positive for drugs on June 10, 2013, Father's parole officer referred him for a substance abuse evaluation. On June 4, 2013, the juvenile court ordered that, if Parents had another positive drug screen, DCS would be relieved from providing services to Parents. Parents drove to an inpatient facility, but became "fed up" with the facility's administrative requirements, and left. *Tr.* at 81.

On June 12, 2013, Parents both tested positive for oxycodone, and Mother tested also tested positive for THC; DCS stopped providing services to Parents. Mother admitted that she used heroin in July 2013. *Id.* at 71. Father participated in an inpatient program for almost two weeks before he walked out, which resulted in Father being arrested in

5

August 2013 for violating his parole. He was incarcerated until one week prior to the termination hearing.

During the CHINS and termination proceedings, Mother was convicted on December 2013 of Class A misdemeanor theft, Class B misdemeanor failure to stop, and Class A misdemeanor criminal trespass and received an aggregate sentence of 844 days of probation. Mother testified that she had not used drugs since the middle of October 2013, and at the time of the termination hearing, she was participating in drug treatment as order by probation. However, on November 2, 2013, while in jail, Mother told a DCS case manager that Mother had snorted an entire bottle of random pills. *Id*. at 174-75.

As to participation in services, Father was supposed to meet with his father engagement case manager every other week after his release from jail in February 2013, but they only met twice. Father cancelled all of the other meetings. Father did not accomplish his goals, and he was unsuccessfully discharged from the program on June 23, 2013. Father never completed an intake for home-based case management and home-based visitation. Mother was referred for home-based case management, and she attended most of her sessions until she was discontinued from services in June 2013. Mother was never able to obtain her own housing. She attended eight individual therapy sessions, but her last session was on January 17, 2013; she was supposed to attend at least twice a month. Mother had been diagnosed with bi-polar disorder and ADHD, but she did not consistently take her medications during the CHINS case. She completed a psychological evaluation and attended medication management, but did not have the money to obtain medication and never completed the application to receive free medication.

As for visitation with the Children, Mother's attendance was consistent "for the most part" until the end of the CHINS case when she "missed a few." *Tr.* at 136. There were some issues with visits with both Parents with Parents' behavior being "suspicious" during some visits. *Id.* at 141. A few times, Mother appeared to be under the influence of something during visits. At one visit, Paternal Grandmother was present and appeared to be under the influence of something, and she was not allowed to return to visits in that condition. During one visit, Mother was involved in a physical altercation with her older daughter in front of the Children, and the police were called. During a visit in April 2013, Mother failed to change S.T.'s diaper for an hour and a half despite being prompted by the service provider several times. On April 23, 2013, DCS arrived with the Children for a visit at Father's home, and he said "his back was out and he could not interact with the [C]hildren like he would want to." *Id.* However, during the visit, Father disappeared into the bathroom for about ten minutes, and when he returned, his demeanor had completely changed, and he was able to interact with the Children on the floor. Father also seemed to be under the influence of something during other visits with the Children.

On August 13, 2013, DCS filed its petition to terminate the Parents' parental rights to the Children. On January 21, 2014, the juvenile court held an evidentiary hearing, which Father failed to attend even though he had been released from incarceration and notified of the hearing date. At the time of the hearing, the Children had been placed with Maternal Grandmother for around eighteen months. During that time, W.T had come out of his shell, and his grades had improved to the point that he was now on the honor roll. I.T.'s speech had improved, and he had reduced his behavior of hitting. S.T. was unable to talk when he was removed from Parents' care and could only communicate by screaming. At the time

7

of the hearing, his communication had improved. The plan for the Children was adoption by Maternal Grandmother, and she was willing to adopt the Children. The DCS case manager testified that termination was in the Children's best interests because of the Children's need for permanency. *Tr.* at 175. The court appointed special advocate ("CASA") also recommended that termination was in the best interests of the Children because the Children needed to be in a stable and permanent home where they could receive the nurturing and structure they required. *Id.* at 184-85. On February 2, 2014, the juvenile court issued its order terminating the Parents' rights to the Children. Parents now appeal. Additional facts will be added as necessary.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

Here, in terminating Mother's parental rights to the Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we

8

determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

    (B)    that one (1) of the following is true:

        (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

        (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

        (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

9

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

Parents argue that the juvenile court erred in terminating their parental rights because DCS failed to prove the required elements for termination by sufficient evidence. They specifically contend that DCS did not establish by clear and convincing evidence that continuation of the parent-child relationship poses a threat to the Children and that termination is in the best interest of the Children.

At the outset, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. In the present case, the juvenile court found that DCS "has proven by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the [Children's] removal or the reasons for placement outside the home of the parents will not be remedied." *Appellant's App.* at 11. The juvenile court made no finding regarding whether there was a probability that the continuation of the parent-child relationship poses a threat to the well-being of the child, which is the condition that Parents challenge as not being supported by sufficient evidence. In order to terminate parental rights, the juvenile court was only required to find

10

that one of the conditions under (b)(2)(B) was supported by clear and convincing evidence, which it did. As Parents have not challenged the evidence supporting the condition found by the juvenile court to support termination, and the juvenile court was only required to find one of the three conditions, we need not address Parents' argument on whether DCS proved by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the children.

Parents next argue that insufficient evidence was presented to prove that termination is in the best interest of the Children. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S., 774 N.E.2d* 927, 930 (Ind. Ct. App. 2002), *trans. denied).* The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

Parents argue that DCS should not have terminated their parental rights merely because of their poverty. However, as the evidence showed, the basis for the juvenile court's termination of Parents' rights was not poverty. The record showed that, at the time

of the termination hearing, the Children had been removed from the Parents and were in the custody of Maternal Grandmother for over eighteen months. During that time, the evidence showed that Parents continued to abuse drugs, failed or refused to engage in services through DCS, did not have suitable housing for the Children, and were both incarcerated at different times. Parents had ongoing substance abuse problems, had multiple positive drug screens, and were not able to maintain sobriety. Mother was evicted from her apartment shortly after the Children were removed and was unable to secure suitable housing for the duration of the case; she was also incarcerated for a period of time as well. Father was incarcerated at the time the Children were removed and remained in jail for a significant portion of the time the CHINS case was pending. Both Parents failed to participate in services provided by DCS and were dismissed from services by DCS for their repeated positive drug screens.

During the time that the Children were in the care of Maternal Grandmother, W.T had come out of his shell and improved his grades, I.T.'s speech and behavior had improved, and S.T.'s communication had improved. At the time of the termination hearing, the plan for the Children was adoption by Maternal Grandmother. The DCS case manager testified that termination was in the Children's best interests because of the Children's need for permanency. *Tr*. at 175. The CASA also recommended that termination was in the best interests of the Children because they needed to be in a stable and permanent home where they could receive the nurturing and structure they require. *Id*. at 184-85. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interest of the Children.

We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Parents' parental rights to the Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

Affirmed.

BAKER, J., and ROBB, J., concur.